## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MELYNDA MOSTELLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 C 1640 |
| v. | ) | |
| | ) | Jeffrey T. Gilbert |
| CAROLYN W. COLVIN, | ) | Magistrate Judge |
| ACTING COMMISIONER OF | ) | |
| SOCIAL SECURITY,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Melynda Mosteller ("Claimant") brings this action under 42 U.S.C.§ 405(g),

seeking reversal or remand of the decision of Respondent Carolyn W. Colvin, Acting

Commissioner of Social Security ("Commissioner"), denying her applications for disability

insurance benefits. This matter is before the court on the parties' cross-motions for summary

judgment [DE##43, 45]. Claimant argues that the decision of the Administrative Law Judge

("ALJ") denying her applications for disability insurance benefits should be reversed or,

alternatively, should be vacated and this case should be remanded to the Social Security

Administration ("SSA") for further proceedings. In support of her motion for summary

judgment, Claimant raises the following issues: (1) whether the ALJ erred in finding that

Claimant's impairments did not meet or medically equal a listing; and (2) whether the ALJ

sufficiently considered Claimant's limitations when making his residual functional capacity

("RFC") determination.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is automatically substituted as the Defendant-Respondent in the case. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

For the reasons discussed herein, Claimant's motion for summary judgment [DE#43] is denied. The Commissioner's motion for summary judgment [DE#45] is granted, and the decision of the Commissioner is affirmed.

## I. BACKGROUND

### A.    Procedural History

Claimant filed an application for disability insurance benefits on September 22, 2006, alleging a disability onset date beginning November 1, 2004. R. 101-06. The SSA denied the application on February 9, 2007, and again upon reconsideration on August 1, 2007. R. 59-60. Claimant filed a timely request for an administrative hearing (R. 74), which was held before an ALJ on March 17, 2009 (R. 20-58). Claimant personally appeared and testified at the hearing, and she was represented by counsel. R. 20-58. Billie Swaytek, Claimant's sister, and Cheryl R. Hoiseth[2], a vocational expert ("VE"), also testified. *Id.* Claimant's mother appeared by telephone but did not testify. *Id.*

The ALJ issued a written decision on May 6, 2009, finding Claimant not disabled under the Social Security Act and therefore denying benefits. R. 9-19. The Social Security Appeals Council denied Claimant's request for review on January 14, 2011, leaving the ALJ's decision as the final decision of the Commissioner. R. 1-3. Claimant seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

### B.    Hearing Testimony

#### 1.    Claimant Melynda Mosteller

Claimant was 36 years old at the time of the hearing. R. 24. She was single and had four children. R. 24. She had a high school education. R. 25.

---

[2] The VE is identified in the hearing transcript as "Mrs. Lyseth" and Exhibit 10B of the administrative record identifies the VE as "Cheryl R. Hoiseth." R. 20-58, 95. The Court adopts the spelling identified in Exhibit 10B.

Claimant testified that she had not worked since November 1, 2004. R. 25. She last worked as a secretary from April 2004 until November 2004. She answered phones, set up appointments, and managed accounts payable and receivable. R. 25-26. She performed the job sitting down and reported she was able to sit, but not for long periods of time, and sometimes she needed to get up and walk around to readjust herself. R. 27, 30. Prior to that, Claimant was a crew leader at a Culver's fast food restaurant for 6-12 months, where she lifted heavy objects such as syrup, meat, and custard. R. 26-27. Claimant worked briefly at a deli counter in 1997, but left because she could not lift heavy meats. R. 29. She also worked as a cashier at a gas station for a few months until the gas station closed. R. 27-28. Claimant had shifts as a server at her sister's restaurants from 1997-1999 and 2001-2002. R. 26-29.

Claimant testified that diverticulosis, diverticulitis, cerebral palsy on the right side of her body, and arthritis on the left side of her body interfered with her ability to work. R. 29. She reported having "ten percent" cerebral palsy on the right side of her body and "no muscle control over the right side." R. 29. As a result, she could not use her right side to do anything. R. 43. She testified that the muscles on her left side had to "overpower" the right side and, consequently, her left side was an inch larger than her right. R. 43, 44.

Claimant testified that she had stabbing pain on her left side at a level of 9 out of 10. R. 43. She took one or two Norco pills every four to six hours as needed and took medication for her nerves. R. 31, 32. She had also received epidural shots in her back at one point, but reported that the shots offered no relief. R. 33. She reported that her left hand was numb and that she woke up screaming and crying four nights per week because she experienced pain shooting into her fingers. R. 45. She only slept three or four hours per night, and she would try to nap for a

couple hours during the day but would sometimes just lay awake in pain. R. 33, 40-41. In the past, she took Ambien, but it did not help. R. 40-41.

Claimant testified that she suffered from stomach and bowel problems and that she had to take eight Imodium four hours prior to leaving her home to go anywhere. R. 30, 32. She testified that the Imodium did not always work and she might end up going to the bathroom on herself anyway. R. 30, 32. She wore a patch on her arm to treat her chronic stomach pains. R. 31-32. She testified that the patch did not always work and so she was required to take additional pain medication because she would otherwise be "doubled over on the couch." R. 32.

Claimant testified that she had depression. R. 30. She took 100 milligrams of amitriptyline once per day and an antidepressant, but they did not help. R. 31, 46. She reported very bad anxiety which occurred suddenly and for no reason. R. 30, 47. The anxiety caused her to feel dizzy and as though she were about to have a heart attack. R. 47. She took two milligrams of Ativan up to three times per day as needed. R. 33. She stated that her pain and depression affected her ability to concentrate. R. 47.

Claimant testified that she could not lift more than ten pounds because of degenerative disc disease in her neck and shoulder. R. 30-31. She had difficulty walking due to knee pain. R. 43-44. She reported needing a knee replacement, but said she was too young to get it done. R. 44. She had severe left ankle swelling which required her to prop her leg up on a pillow throughout the day. R. 44.

Claimant testified that she was 5'3" tall and weighed more than 200 pounds. R. 31. She stated that her obesity put "an even bigger toll" on her body. R. 45. She had difficulty dressing and sometimes required her son to put on her shoes and socks. R. 46. She reported difficulty

4

bending and said she could not kneel, crawl, or stoop. R. 46. She had difficulty going up and down stairs and slept on the couch so she did not have to go upstairs to use the bathroom. R. 49.

Claimant testified that she received help with her daily activities from her family. R. 34. She did not do anything around the house. R. 48. Her son did the laundry and her boyfriend's mother cleaned. R. 34. She initially said that could not drive to the store alone, but later stated she was able to shop and that she occasionally drove. R. 34, 48.

**2. Billie Swaytek**

Ms. Swaytek testified that she saw Claimant weekly. R. 36. She believed Claimant's situation had worsened over the previous year because Claimant began to struggle with simple things such as getting around on a daily basis, functioning, and picking up her children. R. 36. She observed Claimant get "brushed off" by many doctors, which was "frustrating." R. 37.

Ms. Swaytek testified that it had been at least six or seven years since Claimant worked in her restaurants. R. 36. She further stated that Claimant "wasn't even really hired" and did not keep a regular schedule because she was unreliable and missed work often. R. 36-37, 38. Claimant did not have a specific job that she was supposed to do. R. 37. Rather, Ms. Swaytek "used her where she was able to be used" and assigned Claimant tasks such as answering phones, running plates, and rolling silverware. R. 38. Ms. Swaytek let Claimant do things she would not let her regular employees do in order to accommodate Claimant's limitations. R. 38.

**3. Cheryl R. Hoiseth, Vocational Expert**

The VE testified that Claimant's work at Culver's and at the gas station were light and unskilled. R. 52. She stated she was not clear whether Claimant's work at her sister's restaurant was actually a job or an accommodated situation, but that in any event, bartending and

waitressing were light and semi-skilled. R. 52. She said that Claimant's secretarial job did not last long enough for Claimant to acquire the skills outlined in the *Dictionary of Occupational Titles*. R. 52.

The ALJ explained that the state agency physicians assessed Claimant's residual functional capacity ("RFC") as allowing light and sedentary work, subject to postural limitations against climbing ladders, ropes, or scaffolds; no more than occasional balancing, kneeling, stooping, crouching, crawling, and climbing of ramps and stairs; and some limitations in the ability to perform activities within a schedule, maintain regular attendance within customary tolerances, and sustain an ordinary routine without supervision. The VE testified that a person with the above-described RFC and the same age, education, and work experience as Claimant would be able to do all of Claimant's past relevant work except for the cashier position. R. 53. The VE testified that, if further limited to unskilled work, the person would be able to work as an office helper, information clerk, and sales attendant. R. 53-54.

The ALJ asked the VE whether Claimant would be able to perform any jobs if the ALJ fully credited Claimant's hearing testimony regarding her physical and mental limitations. R. 54. The VE stated that the limitations to which Claimant testified would rule out work. R. 54.

## C.    Medical Evidence

### Claimant's Treating Physicians

### 1.  Abdominal Pain and Chronic Diarrhea

Claimant sought treatment at Good Samaritan Hospital on August 3, 2004, complaining of abdominal pain, reflux, and changes in her bowel habits. R. 209-214. Dr. Rafi Ali performed a colonoscopy and esophagogastroduodenoscopy with biopsy and found mild sigmoid

diverticulosis. *Id.* Claimant returned to Dr. Ali on March 17, 2006, complaining of chronic

diarrhea. R. 204-08. Dr. Ali performed another colonoscopy with biopsy and found scattered

diverticula throughout the colon and moderate diverticulosis. *Id.* A March 31, 2006 CT scan

revealed uncomplicated colonic diverticulosis. R. 517.

Claimant went to the emergency room at Central DuPage Hospital in July, September,

and December 2006, each time complaining of abdominal pain and diarrhea. R. 237-58, 260-73,

570-75. CT scans of Claimant's abdomen, pelvis, and liver showed sigmoid diverticulitis and an

ovarian cyst. *Id.* Claimant received IV antibiotics and was improved upon discharge. *Id.*

Claimant returned to the emergency room on March 7, 2007, complaining of abdominal

pain, diarrhea, vomiting, cramping, and headache. R. 360-76. Claimant underwent an air-

contract upper gastrointestinal and small bowel follow-through which showed a more rapid than

normal transit time through the small bowel. *Id.* Her principal diagnosis upon discharge was

diverticulitis. *Id.*

Claimant followed up with her primary care physician, Dr. Melody Derrick, on March

17, 2008. R. 600-01. Claimant complained of severe abdominal pain and diarrhea and reported

taking eight Imodium tablets per day. *Id.* Dr. Derrick ordered a new CT scan to look more

closely at Claimant's suspected irritable bowel syndrome and pain issues. *Id.* The CT scan was

unremarkable. R. 653.

Dr. Darran Moxon performed a colonoscopy on April 24, 2008. R. 664. Dr. Moxon

observed multiple diverticula in the sigmoid colon and large amounts of semisolid stool along

the way to the cecum. *Id.* He concluded that, based on the large amounts of stool left in her

colon, Claimant did not have pathologic diarrhea. *Id.* He opined that Claimant's abdominal pain

was instead probably due to her not going to the bathroom completely, so he placed her on a daily bowel cleanser regimen to help her have two to three complete bowel movements per day. *Id.* He stated that Claimant should not be on Norco, needed to quit smoking, and needed to lose 50 pounds. *Id.*

Claimant returned to Dr. Derrick on May 1, 2008 and reported that the bowel cleanser Dr. Moxon prescribed caused her to have diarrhea every ten minutes. R. 819-22. Dr. Derrick opined that Claimant was in a chronic cycle of having overflow diarrhea due to constipation, which also caused Claimant's abdominal pain. *Id.* She suggested that Claimant's Imodium and Norco intake made the constipation worse, thereby causing more overflow diarrhea. *Id.*

On January 20, 2009, Dr. Derrick noted that Claimant did not agree with Dr. Moxon's overflow diarrhea diagnosis, did not take the prescribed bowel cleanser, and was still taking eight Imodium tablets per day. R. 753.

## 2. Knee and Ankle Pain

Claimant sustained knee and ankle injuries while stepping off her friend's motorcycle in September 2001. R. 408-11. An X-ray revealed a left ankle fracture. *Id.* Dr. Kevin Walsh surgically repaired the fracture on September 22, 2001. *Id.*

Claimant returned to Dr. Walsh on December 19, 2001, complaining that her knee was popping in and out. R. 405-07. A left knee MRI revealed a tear in the anterior horn of the lateral meniscus. *Id.*

Dr. Walsh administered three injections in Claimant's left ankle in 2003. R. 423-27. A September 30, 2003 X-ray revealed that Claimant's fracture was healed, but that the ankle

mortise was widened medially. Dr. Walsh noted Claimant was at risk for premature osteoarthritis and said she was headed towards an ankle fusion or ankle replacement. *Id.*

Dr. Walsh completed an Arthritic Report for the Bureau of Disability Determination Services on November 24, 2006. R. 307-09. He noted that Claimant had pain, tenderness, stiffness, swelling, and deformity in her left knee and ankle but that her ambulation was normal and she did not need an assistive device. *Id.* He stated Claimant needed to include periods of walking around during an eight-hour workday and that she would need a job that permitted shifting positions at will from sitting, standing, and walking. *Id.* He noted that Claimant's ankle surgery was effective and that her response to treatment was good. *Id.*

Claimant returned to Dr. Walsh in February 2007 complaining of left ankle pain. R. 387-91. Dr. Walsh noted a slight widening of the ankle mortise medially but found no evidence of significant osteoarthritis and reported Claimant had excellent motion and strength. *Id.* He removed the hardware in Claimant's left ankle on February 2, 2007. *Id.*

On June 23, 2008, Claimant reported to Dr. Derrick that she felt her kneecap sliding in and out of place after falling in her kitchen. R. 799-802. An MRI showed that Claimant's pain was likely due to a cartilage irritation under the kneecap. *Id.* Claimant was advised that rest, ice, anti-inflammatory medication, shoe inserts, and strengthening exercises would reduce the pain. *Id.*

Claimant reported knee pain after falling in CVS on February 20, 2009. R. 743-48. Claimant's X-rays were normal. *Id.* Dr. Derrick noted exam findings that may have indicated a ligament tear and recommended an MRI. *Id.*

### 3. Back and Upper Extremity Pain

Claimant got a cervical spine X-ray and EMG of the upper extremities in October 2003. R. 397, 401. Both examinations were normal. *Id.* Claimant then began physical therapy, but was discharged in November due to noncompliance after failing to attend five of her scheduled appointments. R. 395.

Claimant went to the emergency room at Central DuPage Hospital on May 17, 2006, complaining of new back and neck pain after her sister cracked her back. R. 526-30. A cervical spine image was normal and Claimant had normal ambulation and strength. *Id.*

Claimant had new X-rays taken of her back, neck, and shoulder on April 8, 2008. R. 633-35. All of the X-rays were normal. R. 827. Dr. Derrick referred Claimant to physical therapy, explaining it would "definitely help" with Claimant's pain symptoms. R. 827. Claimant began physical therapy on April 16, 2008. R. 657-59. She was discharged on June 9, 2008 after missing multiple appointments and failing to return the therapist's phone calls. R. 669.

A May 7, 2008 cervical MRI revealed mild degenerative changes at C5-C6 and C6-C7. R. 632-33. Claimant underwent a series of cervical epidural steroid injections in July 2008. 604-05, 610-13.

Claimant returned to the emergency room on September 22, 2008, complaining of severe lower back pain radiating to her left leg. R. 727-31. Spinal images were normal. *Id.* Claimant saw Dr. Derrick the next day for a follow-up appointment. R. 778. Dr. Derrick noted that Claimant's bilateral upper and lower extremity strength were 5/5 and Claimant had no sensation loss in her left arm. *Id.*

Claimant underwent a lumbar spine MRI on November 2, 2008 after reporting that she was still in pain. R. 738. Dr. Derrick reviewed the MRI, found no bulging or herniated discs, and recommended physical therapy or referral to an orthopedist. R. 767.

### 4. Anxiety

Claimant went to the emergency room at Central DuPage Hospital on April 10, 2006, complaining of chest pains. R. 519-22, 531-33. Claimant's chest images were normal and she was diagnosed as having a panic attack. *Id.*

Claimant returned to the emergency room on September 22, 2008 and again on September 23, 2008, each time complaining of chest pain radiating down into her left arm. R. 704-26, 732-33. Claimant's chest X-ray and CT scan were normal. *Id.* Dr. Robert Hendel noted that Claimant appeared to have some sort of myositis, but no acute coronary syndrome. *Id.* Claimant's primary diagnosis was anxiety. *Id.*

### 5. Rizwan Bajwa, D.O.

A March 2007 MRI of Claimant's brain revealed congenital development abnormalities and probable schizencephaly over the left temporal parietal region. R. 374. Dr. Rizwan Bajwa diagnosed Claimant with "cephalgia, rather mild in nature," and concluded that Claimant's schizencephaly was likely due to prenatal ischemia and irrelevant to her current headaches. R. 363-64.

Upon physical exam, Dr. Bajwa found minimal 4/5 weakness in Claimant's right-hand grip and right-hand dorsiflexion. *Id.* Claimant's reflexes were slightly brisk on the right side at 3/4 compared to the left. *Id.* There was decreased sensation of the right upper and lower extremities. *Id.* Claimant's coordination was normal. *Id.* Dr. Bajwa noted Claimant's self-

report of cerebral palsy, which affected Claimant's right arm and leg but which was "rather mild according to [Claimant]." *Id.*

### 6. Pain Medication

Dr. Derrick provided follow-up treatment for Claimant's impairments through 2008 and 2009. On April 17, 2008, Dr. Derrick refused Claimant's request for a Norco refill because Claimant's last refill occurred a week prior and Claimant was only supposed to have one refill per month. R. 826. Dr. Derrick agreed to refill the prescription the next day, but noted she was increasing the dosage and advised Claimant she should not be using more than 60 pills per month. R. 825.

Claimant requested another Norco refill ten days later, which Dr. Derrick refused. R. 823. Dr. Derrick noted Claimant was taking "way too many Norco," with an average of six per day. *Id.* Dr. Derrick pointed out that she had recently increased the dosage from 5mg to 7.5mg and that Claimant should be taking a maximum of four pills per day, "and that only on a bad day." *Id.* Dr. Derrick subsequently decided to cut back on Claimant's Norco and start Claimant on a fentanyl patch, with the eventual goal of completely cutting out the Norco. R. 822.

Claimant requested another Norco refill on May 15, 2008. R. 813-14. Dr. Derrick asked Claimant why she took 60 Norco pills in 14 days, given that Claimant should be using less Norco after starting the fentanyl patch. *Id.* Claimant told Dr. Derrick she had to wait for state approval before receiving the fentanyl patch, and that, while the patch helped a little, "some days she needs more Norco to get her through the pain." *Id.*

Claimant requested another Norco refill on July 14, 2008, three weeks after her last refill. R. 796. Dr. Derrick remarked that the goal of starting Claimant on the fentanyl patch was to stop

the Norco completely, and that if Claimant was having that much pain with both the fentanyl patch and the higher Norco dosage, she should be treated at a pain clinic. *Id.* She agreed to refill the Norco early "THIS time" but stated that, in the future, Claimant would have to get her pain medication from a pain clinic. *Id.*

### DDS Physicians

#### a. Roopa K. Karri, M.D.

Dr. Roopa Karri performed an internal medicine consultative examination for the Bureau of Disability Determination Services on January 16, 2007. R. 328-31. Claimant told Dr. Karri she had a history of cerebral palsy on the right side causing ten percent malfunction, arthritis in the left knee and ankle, bowel and stomach problems, low back pain, and depression. *Id.* She stated her hands were numb and she had difficulty holdings things in her right hand. *Id.*

Dr. Karri noted that Claimant was obese at 5'3" tall and 220 pounds. *Id.* She noted some atrophy of Claimant's right calf, which measured at 14.5" compared to 15.75" inches on the left. *Id.* She noted that Claimant was limping on the left leg but did not require the use of assistive devices. *Id.* She evaluated Claimant's grip strength at in the right hand and 5/5 in the left hand and noted that Claimant was able to make fists, oppose fingers, turn doorknobs, button buttons, and write. *Id.* Claimant's strength was 4/5 in the right upper and both lower limbs, and 5/5 in the left upper limb. *Id.* Claimant's range of motion in her shoulders, elbows, wrists, and hips were normal. *Id.* Claimant had a mildly decreased range of motion in her knees. *Id.*

#### b. Vidya Madala, M.D.

Dr. Vidya Madala completed a physical RFC assessment on January 31, 2007. R. 332-39. She found Claimant could occasionally lift and/or carry up to 20 pounds, frequently lift

and/or carry 10 pounds, stand and/or walk about six hours in an eight-hour workday, and sit

about six hours in an eight-hour workday. *Id.* She stated Claimant had no postural,

manipulative, visual, communicative, or environmental limitations. *Id.* She referenced Dr.

Karri's consultative examination report and acknowledged Claimant's limp, decreased range of

motion and strength in the lower left extremity, decreased motor strength on the left side, and

motor/grip strength of 4/5 on the right side. *Id.* She also noted Claimant's "chronic diarrhea of

unknown etiology" and determined Claimant would need frequent bathroom breaks. *Id.*

### c. Barbara F. Sherman, Psy.D.

Dr. Barbara Sherman performed a psychological consultative examination for the Bureau

of Disability Determination Services on January 16, 2007. R. 321-26. Claimant reported to Dr.

Sherman that she was disabled due to ten percent cerebral palsy on her right side, residual effects

on her left side including ankle, knee, and back problems, and frequent diarrhea. *Id.* Claimant

further reported poor sleep, anxiety attacks, and seizures in early infancy. *Id.*

Dr. Sherman diagnosed Claimant with cognitive disorder, panic disorder, and recurrent

major depression. *Id.* She noted Claimant's depression was currently in remission, with

symptoms controlled by antidepressant drugs. *Id.* She found no signs of psychosis. *Id.* She

identified some deficits for concentration, fund of information, and conceptual thought, and

noted Claimant's commonsense reasoning and judgment deteriorate when Claimant is

emotionally aroused. *Id.* She opined that Claimant's disorders would prevent her from being

able to manage her funds without family assistance. *Id.*

### d. Erika Altman, Ph.D.

On February 2, 2007, Dr. Erika Altman assessed Claimant's limitations as they related to her cognitive disorder, depression, and panic disorder under Listings 12.02, 12.04, and 12.06. R. 340-53. Dr. Altman found Claimant to have mild difficulties in maintaining social functioning and a mild restriction of activities of daily living. *Id.* She found Claimant had moderate difficulties in maintaining concentration, persistence, or pace. *Id.* She found no episodes of decompensation of extended duration. She further found that the evidence did not establish the presence of the Listings' paragraph C criteria. *Id.*

Dr. Altman then completed a mental RFC assessment. R. 354-57. Dr. Altman found Claimant to be moderately limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary routine without special supervision. *Id.* She identified no other limitations. *Id.* She noted that Claimant can prepare simple meals, perform household tasks with help from family, drive, leave home unaccompanied, shop, handle finances, and spend time with others. *Id.* She further noted that Claimant can understand, carry out, and remember simple instructions, make simple work-related decisions, respond appropriately to others, and deal with routine work settings. *Id.*

## D. The ALJ's Decision

On May 6, 2009, the ALJ issued his decision finding that Claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act.

The ALJ reviewed Claimant's application under the required five-step sequential process. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged disability onset date of November 1, 2004. R. 15. At step two, the ALJ found that

15

Claimant had severe impairments: cerebral palsy, osteoarthritis and allied disorder, and an anxiety related disorder. R. 15. At step three, the ALJ found that Claimant's impairments did not meet or medically equal any of the listing impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526). R. 15. Specifically, the ALJ found that Claimant did not satisfy listing 12.06 (anxiety-related disorders) because Claimant had not experienced any episodes of decompensation of extended duration, suffered only "mild restrictions in activities of daily living, mild difficulties in social functioning, and moderate difficulties with regard to concentration, persistence or pace," and failed to establish the presence of the criteria in paragraph C of the listing. R. 15.

The ALJ determined that Claimant had the residual functional capacity to perform light work, as defined in 20 C.F.R. § 404.1567(b), with postural limitations against climbing ropes, ladders, and scaffolds; no more than occasional balancing, kneeling, stooping, crouching, crawling, or climbing ropes and stairs; and moderate limitations in the abilities to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary routine without special supervision. R. 16. At step four, the ALJ found that, based on her RFC, Claimant was capable of performing her past relevant work as a secretary, restaurant crew leader, waitress/bartender, cashier, and stocker. R. 19. Because the ALJ determined Claimant was capable of performing her past relevant work, he concluded that Claimant was not disabled. R. 19.

## II. LEGAL STANDARD

### A.    Standard of Review

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B. Disability Standard

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act.[3] *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven she cannot continue her past

---

[3] The standard for determining "disability" for SSI is "virtually identical" to that used for disability insurance benefits ("DIB"). *Hankerson v. Harris*, 636 F.2d 893, 895 n.2 (2d Cir. 1980); *see Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."); *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007); *Knipe v. Heckler*, 755 F.2d 141, 145 n.8 (10th Cir. 1985). Accordingly, this Court cites to both SSI and DIB cases.

relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Claimant raises the following issues in support of her motion for summary judgment: (1) whether the ALJ erred in failing to find that Claimant's impairments did not meet or medically equal a listing; and (2) whether the ALJ sufficiently considered Claimant's limitations when making his residual functional capacity ("RFC") determination..

### A. The ALJ did not err in finding that Claimant's impairments did not meet or medically equal a listing.

At Step 3 of the required five-step sequential analysis, an ALJ must determine whether a claimant has an impairment or combination of impairments that meets or medically equals any of the listing impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526). If so, the claimant is presumptively disabled. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2007). Before an ALJ provides a Step 3 analysis, however, the claimant must first present medical findings that match or equal in severity all the criteria specified by a listing. *Knox v. Astrue*, 327 Fed.Appx. 652, 655 (7th Cir. 2009). Where the claimant does not present such evidence, an ALJ need not refer to a specific listing at Step 3. *See id.*

Once the claimant meets her burden, then the ALJ must satisfy three requirements when addressing a listing. First, the ALJ is required to provide "more than a perfunctory analysis" of the listing. *Barnett* at 664. Second, because the listings involve medical judgments, the ALJ must consider a medical expert's opinion on the issue in question. *Id.* at 670. Finally, the listing under consideration should be identified by name. *Id.* at 664. However, the ALJ does not err if

he fails to identify a specific listing by name, so long as his discussion of the evidence is not perfunctory. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

### a. Listing 11.07 (Cerebral Palsy)

Claimant argues that the ALJ erred in not reviewing Listing 11.07 (Cerebral Palsy). Claimant's Brief [DE#44] at 8, 9. Specifically, Claimant argues the ALJ should have addressed whether Claimant met the cerebral palsy listing under subsections 11.07B (cerebral palsy with "abnormal behavior patterns, such as destructiveness or emotional instability") and/or 11.07D (cerebral palsy with "disorganization of motor function" that is "significant and persistent" and results "in sustained disturbance of gross and dexterous movements, or gait and station"). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.07.

Claimant has not pointed to any evidence that supports her argument that she met Listing 11.07. Claimant recites a laundry list of doctors' findings, including the fact that she limps, that her grip strength is 4/5 in the right hand and 5/5 in the left, and that she has "mild weakness" and a "mildly decreased" range of motion (Claimant's Brief [DE#44] at 9), but she points to nothing in the record attributing these admittedly mild impairments to cerebral palsy. She points to no cerebral palsy diagnosis from any medical provider, and the only evidence she cites referencing a cerebral palsy diagnosis is a statement from her mother, who reported that Claimant "was diagnosed with CP when she was 7 years old." Claimant's Brief [DE#44] at 8. She never sought treatment for cerebral palsy. In the plethora of medical records making up her administrative file, cerebral palsy is mentioned so infrequently that even Claimant admits a cerebral palsy analysis "does not appear to have been done by her own doctors." Claimant's Reply Brief [DE#47] at 3. As Claimant has presented no objective medical evidence supporting her position

that her impairments met or equaled Listing 11.07, the ALJ was under no obligation to consider it. *See Knox v. Astrue*, 327 Fed.Appx. at 655.

Where cerebral palsy is mentioned in Claimant's medical records, it is usually in the context of a recording of Claimant's own self-reports. *See, e.g.*, R. 322 ("She believes that she had seizures in early infancy and consequently suffered from cerebral palsy."), 405 ("The patient tells me she has cerebral palsy and indicates that she believes she has '10%' cerebral palsy."). An impairment must be established by medical or laboratory evidence, though, and Claimant's statements alone are not enough. 20 C.F.R. § 404.1508, *Brihn v. Astrue*, 332 Fed.Appx. 329, 332 (7th Cir. 2009). Even if they were, Claimant herself consistently stated that her cerebral palsy was "rather mild" in nature, R. 363, affecting only "ten percent" of her right side. *See, e.g.*, Claimant's Brief [DE#44] at 9, R. 405. Such statements belie Claimant's testimony that she cannot use her right side to do "anything." R. 43.

Even if Claimant's own statements were sufficient to establish an impairment, there is no reversible error here. Claimant testified that her cerebral palsy resulted in her having "no muscle control over the right side" (R. 29) and, that as a result, she could not use her right side to do anything. R. 43. Claimant alleged no other limitations due to her cerebral palsy. The ALJ noted, however, that Claimant's internal medical consultative examination revealed a grip strength of 4/5 on the right side and overall strength of 4/5 on the right side. R. 18. The ALJ also noted that Claimant was able to make fists, oppose fingers, turn doorknobs, button buttons and write. *Id.* Though the ALJ did not mention Listing 11.07 by name, these findings demonstrate that he nonetheless addressed Claimant's cerebral palsy complaints in his analysis. Accordingly, there is no ground for remand. *See Ribaudo* 458 F.3d at 583.

Nevertheless, Claimant contends that the ALJ ought to have "speculate[d] on" the "impact of the disease," despite also admitting that that analysis "does not appear to have been done by her own doctors." Claimant's Reply Brief [DE#47] at 3. Claimant is essentially arguing that the ALJ ought to have engaged in his own lay analysis of cerebral palsy progression. That is precisely what the ALJ cannot do. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.").

Instead, the ALJ properly considered only the documented medical findings in making his decision. The ALJ explained that he adopted the reviewing physicians' expert conclusions that Claimant did not meet or equal any listings. R. 19 ("This expert evidence under SSR 96-6p is adopted since consistent with the medical and other evidence at the time and subsequently added."). The ALJ further explained that the reviewing physicians relied on Dr. Karri's consultative examination notes, which identified Claimant's reported history of cerebral palsy, in reaching their conclusions. R. 19. Claimant cites to no evidence in the record contradicting the reviewing physicians' findings, and the Court has found none. Accordingly, the ALJ was entitled to rely on those conclusions with little additional explanation. *See Ribaudo*, 458 F.3d at 584 (7th Cir. 2006).

Claimant also contends that the ALJ should have related her anxiety to cerebral palsy, Claimant's Brief [DE#44] at 8, and says her abuse of pain medication amounts to an "abnormal behavior pattern" sufficient to meet Listing 11.07B. Claimant's Reply Brief [DE#47] at 4. Similarly, Claimant argues that the ALJ should have related her left-sided pain, "mild" right-sided weakness and atrophy, "mildly decreased" range of motion, limp, and mildly reduced grip

strength to cerebral palsy, suggesting they resulted in "sustained disturbance of gross and dexterous movements of gait and station" under Listing 11.07D. Claimant's Brief [DE#44] at 9. Claimant acknowledges that the ALJ reviewed these symptoms in his opinion but argues that the review fell short because the ALJ did not specifically relate the symptoms to cerebral palsy. Claimant does not explain how she thinks the ALJ's analysis fell short in this regard, nor does she cite any evidence in support of her conclusory assertions that the symptoms she cites meet a listing. Accordingly, the Court need not discuss them. *See U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

### b. Listing 1.00B2(b)

Claimant's next argument appears to be that the ALJ did not adequately consider the combined effect of her osteoarthritis and chronic obesity in reducing her ability to ambulate effectively, as defined in Listing 1.00B2(b). Claimant's Brief [DE#44] at 9-10. Claimant cites no evidence supporting her assertion that her obesity and other impairments "would certainly impact her ability to ambulate effectively" (Claimant's Brief at 10). Nor is there any such support in the record. In fact, the record evidence is to the contrary. For example, Dr. Walsh, Claimant's own treating physician, asserted that Claimant could ambulate normally without an assistive device. Dr. Karri acknowledged Claimant's obesity and history of arthritis but also found that Claimant could ambulate without an assistive device and placed no restrictions on any of her functioning due to obesity. The reviewing physicians, relying in part on Dr. Karri's report, also found that Claimant did not meet or medically equal any listing, including Listing 1.00B2(b). Even Claimant could not articulate how her obesity affected her ability to ambulate, stating only that it sometimes made it difficult for her to put on her shoes and socks. R. 46.

It is clear from the record that the ALJ considered these factors. In his opinion, the ALJ specifically noted Dr. Karri's finding that Claimant did not require the use of an assistive device. R. 14, 18. The ALJ also properly relied on the reviewing physicians' opinions in reaching his conclusion that Claimant did not meet a listing. The Court is able to trace the path of the ALJ's reasoning on the issue, and Claimant's argument is unavailing. *See Ribaudo* at 584 (an ALJ is entitled to rely on the state reviewing physicians' opinions that Claimant does not meet or medically equal a listing); *see also Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (an ALJ's failure to explicitly address obesity is harmless error where a Claimant fails to specify how her obesity impairs her ability to work and where the record relied upon by the ALJ sufficiently analyzes obesity).

## B. The ALJ sufficiently considered Claimant's limitations when making his RFC determination.

Claimant presents a number of perfunctory arguments that the ALJ erred in determining her RFC. A claimant's RFC is the maximum work she can do despite any limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a legal conclusion reserved to the ALJ. 20 C.F.R. § 404.1545(a)(1). In making an RFC determination, the ALJ must consider all relevant evidence, including objective medical evidence as well as testimony by the claimant. *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

The Court addresses each of Claimant's arguments in turn below and finds that the ALJ sufficiently considered all of Claimant's limitations in making his RFC determination.

### a. Claimant's Pain

Claimant first argues that the ALJ "did not consider pain and emphasizes evidence that suggests pain is not real." Claimant's Brief [DE#44] at 10. In making this argument, however,

Claimant concedes that the ALJ discussed her back, knee, ankle, and abdominal pain. Claimant's Brief [DE#44] at 10-11. For example, the ALJ addressed Claimant's abdominal pain and gastrointestinal problems, finding Claimant's refusal to follow Dr. Moxon's instructions to take a daily bowel cleanser particularly relevant. R. 18. The ALJ also acknowledged that Claimant's back MRI showed degenerative changes, but pointed out that Claimant was subsequently dismissed from physical therapy because she did not attend appointments and did not return the therapist's phone calls. *Id.* The ALJ further noted that Claimant went to the emergency room on September 22, 2008 complaining of severe low back pain radiating into her leg, but upon discharge, was advised that no physical problem could be identified. R. 18. Instead, Claimant's doctors determined she suffered from anxiety. *Id.* Finally, the ALJ found it "noteworthy" that Claimant's treating physicians refused to refill her prescriptions on various occasions, and concluded that abuse of pain medications was, at times, a factor in Claimant's complaints as to her symptoms. R. 17-18.

These specific examples given by the ALJ demonstrate not only that he considered Claimant's pain, but also that he found it less debilitating than Claimant alleges. In other words, these examples "sufficiently connected the dots between [Claimant's] impairments, supported by substantial evidence in the record, and the RFC finding." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). Claimant has pointed to no other evidence, medical or otherwise, that she believes the ALJ should have considered in making his RFC determination. Nor has Claimant argued how the ALJ erred besides suggesting he came to the wrong conclusion in determining that Claimant's pain was not as debilitating as she alleges. The Court, however, will not displace

25

the ALJ's judgment where it is supported by substantial evidence, *see, e.g., Elder v. Astrue*, 529 F.3d at 413, and Claimant's argument is unavailing.

### b. State Evaluator's Opinion

Claimant next challenges the ALJ's RFC finding based on an administrative report from Steve Gragert, a state agency disability examiner, who opined that Claimant would be unable to return to "more than unskilled past work." Claimant's Brief [DE#44] at 11. Gragert, however, is not a medical or vocational expert, and his administrative finding is not itself evidence. *See* 20 C.F.R. 404.1527(e)(1)(i) ("These administrative findings of fact are based on the evidence in your case but are not in themselves evidence at the level of the administrative review process at which they are made."). Accordingly, the ALJ was not required to give any weight to Gragert's conclusion. Claimant has pointed to no other evidence suggesting the ALJ should have limited her to unskilled work.

### c. VE's Opinion

Claimant contends that the ALJ should have found her RFC to be less than sedentary and preclusive of all work, because the VE opined that Claimant would be unable to work if the ALJ fully credited Claimant's hearing testimony. Claimant's Brief [DE#44] at 11-12. But the ALJ specifically found that Claimant's statements were not credible (R. 16) and Claimant does not challenge the ALJ's credibility finding. As such, the ALJ properly excluded this particular VE opinion from his RFC finding. *See Schmidt v. Astrue*, 496 F.3d 833, 845-46 (7th Cir. 2007) (finding that "the ALJ is required only to incorporate into his hypotheticals [to the VE] those impairments and limitations that he accepts as credible").

### d. Dr. Erika Altman's Opinion

Claimant cites Dr. Altman's findings that she is moderately limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary routine without special supervision, alleging that these limitations should have been considered in restricting her RFC and would preclude her from working. Claimant's Brief [DE#44] at 12.

The ALJ explicitly included these restrictions in his RFC determination. R. 16. Claimant does not argue that the ALJ improperly relied on Dr. Altman's opinion; Claimant instead argues that these restrictions would eliminate all jobs. Yet the VE determined that all of Claimant's past work, except for her cashier position, would accommodate those restrictions. R. 53. Claimant presented no evidence to the contrary, and the ALJ was entitled to rely on the VE's testimony. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). Accordingly, Claimant's arguments are without merit.

### e. Claimant's Chronic Diarrhea

Lastly, Claimant contends that the ALJ did not consider her need for reasonable and regular bathroom breaks. Claimant's Brief [DE#44] at 12. As noted above, the ALJ emphasized Dr. Moxon's conclusion that Claimant was, in fact, constipated, that she should not be taking Norco, and that she should be taking a daily bowel cleanser. R. 17. The ALJ also pointed out that Claimant did not take her prescribed bowel cleanser because she did not agree with the diagnosis. R. 18.

In her Response Brief, Claimant contends that she did take her prescribed medication and points to medical records showing she took eight Imodium tablets prior to leaving her home.

Claimant's Response [DE#47] at 2. That is exactly what Claimant's physicians told her not to do, as both Dr. Moxon and Dr. Derrick opined that Claimant's overflow diarrhea was due to constipation, with Dr. Derrick noting that the Imodium made Claimant's constipation worse. R. 822. Claimant points to no other reason why she did not follow her physician's prescribed course of treatment. As such, the ALJ rightfully did not consider her alleged need for regular bathroom breaks in determining her RFC. *See* 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying your benefits.").

## C. The ALJ reasonably relied on the reviewing physicians' opinions.

In her reply brief, Claimant argues for the first time that the ALJ unreasonably relied on the reviewing physicians' opinions because their opinions predated the hearing by two years. Claimant's Response [DE#47] at 1-2. It is well settled that arguments raised for the first time in a reply brief are waived. *See, e.g., Sims vs. Barnhart*, 171 Fed.Appx. 520, 526 (7th Cir. 2006). But even if Claimant had properly raised this argument, remand would not be warranted. The ALJ explained that he adopted the reviewing physicians' opinions because they were "consistent with the medical and other evidence at the time *and subsequently added*." R. 19 (emphasis added). This makes clear that the ALJ reviewed Claimant's later medical evidence and determined that the reviewing physicians' opinions were still valid. Claimant points to nothing in the record suggesting otherwise.

## IV. CONCLUSION

For the reasons set forth in the Court's Memorandum Opinion and Order, Claimant's motion for summary judgment [DE#43] is denied. The Commissioner's cross-motion [DE#45] is granted, and the Commissioner's decision denying Claimant's application for disability benefits is affirmed.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: August 28, 2014